## M'GUIRE *vs.* KERR.

*In the matter of proving the last will and testament of* CATHARINE KERR, *deceased.*

ON allegations filed by the daughter and only next of kin of the deceased, the evidence of testamentary capacity, and of due execution not being satisfactory, and the will not having been signed by the testatrix and the witnesses at the end, the decree of probate was *revoked.*

Where, at the time of execution, the decedent was in a state of stupor, though perhaps capable of being aroused so as to perform a sensible action, the proof to establish a rational act should be of the clearest character ; and that failing, probate should be denied.

The statute requiring the will to be signed at the end by the testatrix and the witnesses, demands that they should all agree as to what the end of the will is ; and where the signature of the testatrix purported to be signed in one place ; then followed the appointment of executors, to which the names of the witnesses were signed ; and then came a further provision, to which the name of the testatrix was again put—the witnesses and the testatrix in no instance coinciding as to where the end of the will was—*Held,* that the will was not validly executed.

J. M'KEON *and* A. L. ROBERTSON, *for next of kin.*

I. The execution of this will took place not earlier than three o'clock of the afternoon of the third day before her death.

II. As the decedent was then advanced in years, weak, in the last stages of a violent typhus fever, generally in a state of stupor, insensible to occurrences around her, occasionally delirious with incoherent mutterings, and only

capable of answering a question on being roused, "*her capacity was not so alive as to prevent her executing an instrument of the contents of which she was not aware.*" (*Billinghurst* vs. *Vickers*, 1 *Phil.*, 193; *Harwood* vs. *Baker*, 3 *Mo. Pr. C. C.*, 285; *Merrit* vs. *Johnson*, 2 *South*, (*N. J.*) 455; *Tomkins* vs. *Tomkins*, 1 *Bail* (*S. C.*), 96.)

III. The relation of the person who drew the will, to the decedent, and his interest in its provisions, raise the presumption of undue influence, not repelled by sufficient proof of spontaneity and understanding. (*Huguenin* vs. *Baseley*, 14 *Ves.*, 287; *Harwood* vs. *Baker*, 3 *Mo. Pr. C. C.*, 290; 1 *Swinb. on Wills*, 191; *Marsh* vs. *Tyrrell & Harding*, 2 *Hag. Ec. R.*, 87; *Billinghurst* vs. *Vickers*, 1 *Phil.*, 199; *Ingram* vs. *Wyatt*, 1 *Hag. Ec. R.*, 449; *Baker* vs. *Batt.*, 2 *Mo. Pr. C. C.*, 321, *pr. J. Parke.*)

IV. The conduct of the draughtsman of the will is attended with circumstances of suspicion.

1st. His denial of being the established spiritual director of the decedent.

2d. His supervision even of letters to her daughter under pretence of literary correction. (*Griffiths* vs. *Robins*, 3 *Madd. R.*, 191; *Whelan* vs. *Whelan*, 3 *Cow.*, 583.)

3d. His interference to procure her removal from the care of relatives in her own house, to a religious hospital, under the care of hired nurses.

4th. His exclusion of all persons at the execution, except parties interested, and a strange witness summoned for the occasion. (*Brydges* vs. *King*, 1 *Hag. Ec. R.*, 262, 310; *Blewitt* vs. *Blewitt*, 4 *Hag. Ec. R.*, 419.)

5th. His interference by taking possession of money belonging to her, and disposing of it, and demanding the keys of the house from Mrs. Norton.

6th. His activity in getting up the will without the presence of counsel; his suggesting provisions in it, and

inducing her to sign it, by representing it to be merely temporary.

7th. His omission to have her read what she was to sign.

8th. His testimony as to the decedent's actual signing, and as to her name, and his eagerness to deny all improper influence in advance.

V. The will or codicil was not in due form.

1st. The signatures were not the decedent's, and there is no proof she acknowledged them as such. Her assent to the instrument was before it was signed. (*Best on Presumption, Law Lib., N. S., Vol.* 31, *p.* 223 ; *Ilott* vs. *Genge,* 4 *Mo. P. C. C.,* 266 ; *Grant* vs. *Grant,* 1 *Sand. Ch.,* 237 ; *Chaffee* vs. *Bapt. Miss. Con.,* 10 *Paige,* 85 ; *Blake* vs. *Knight,* 3 *Curt.,* 547.)

2d. If the will ended with the clause appointing executors, it was not signed by the decedent at the end. (2 *Robertson,* 140 ; 13 *Jurist,* 289 ; 6 *Moore P. C. C.,* 404.)

3d. If it ended before the clause appointing executors, or after that directing the payment of debts, it was not signed at the end by the witnesses. (5 *Notes Cases,* 428 ; 6 *Notes Cases,* 20 ; 4 *Ib.,* 480, 253, 469, 260 ; 5, 375 ; 2, 350 ; 2 *Curt.,* 342 ; 3, 748 ; 1, 912 ; *In Bonis Batten,* 7 *N. C.,* 289 ; *In Bonis Shadwell,* 7 *N. C.,* 377 ; *In Bonis Pain,* 14 *Lond. Ju.,* 1032 ; 1 *Eng. L. and Eq. R.,* 635.)

---

J. SPARKS, *for Executors.*

I. The testatrix, Catharine Kerr, at the time of making her will and codicil, was of sound mind and memory, and capable of disposing of her property by will. However weak her mind may have been—unless she was entirely deprived of her understanding—her will and codicil cannot, for that reason, be avoided. (*Stewart's Exr.* vs. *Lispenard and others,* 26 *Wend.,* 255 ; *Blanchard* vs. *Nestle,* 3 *Denio,* 37 ; *Clarke* vs. *Sawyer,* 3 *Sandford Ch. Rep.,* 351.

II. Both of the subscribing witnesses to the will and codicil testify that the testatrix signed the will and codicil. R. Kein swears positively that she made the three signatures. M. M. Smyth is only in doubt about the second signature. Their testimony is supported by Catharine M'Ginnis, the nurse, who states that she heard from the Sisters in the Hospital, on the same day that the will was executed, that a will had been drawn, and that she saw pen, ink and paper in the room. Also, by Honora Norton, who testifies that the testatrix told her, after the will was drawn and executed, that she (the testatrix) was " after making her will," meaning that she had already made it.

III. The conveyances, &c., offered in evidence by the contestant, and alleged to have been executed by the testatrix in her life time, cannot be admitted in evidence, for the Court to compare the signatures thereto with those to the will, and thus by comparison form an opinion as to the genuineness of the signatures of the testatrix to the will.

IV. The misspelling of the surname Kerr in the signatures is no evidence that the will and codicil were not signed by the testatrix. R. Kein, one of the subscribing witnesses, may have dictated to the testatrix, as she wrote her name, the letters composing her name, as he supposed it was spelled.

V. The testatrix signed the will and codicil in the presence of both of the subscribing witnesses.

VI. The acknowledgment of the testatrix, that the instrument she signed was her last will and testament, is a sufficient compliance with the statute. It is immaterial whether the testatrix acknowledged the instrument prior or subsequent to signing, if the whole was done in one act. (*Doe* vs. *Roe*, 2 *Barb.*, *Sup. Ct. R.*, 200.)

VII. Richard Kein swears positively that the testatrix

requested him and Smyth to sign their names as witnesses to the will. The law presumes such to have been the case. (*Butler* vs. *Benson*, 1 *Barb.*, *Sup. Ct. R.*, 527; *Doe* vs. *Roe*, 2 *Ibid.*, 200; *Brinkerhoff*, &c., vs. *Remsen and Brinkerhoff*, 8 *Paige*, 488; *Chaffee*, &c., vs. *Bapt. Miss. Con.*, 10 *Paige*, 85.)

8th. Where one of the subscribing witnesses to a will swears that all the formalities required by the statute were complied with in the execution thereof, the will may be admitted to probate. (*Nelson* vs. *M'Giffert*, 3 *Barb. Ch. Rep.*, 158; *Jauncey* vs. *Thorne*, 2 *Ibid.*, 40.)

9th. The will of the testatrix was executed substantially according to the provisions of the Revised Statutes, which is sufficient. (*Nelson* vs. *M'Giffert*, 3 *Barb. Ch. Rep.*, 158; *Seguine* vs. *Seguine*, 2 *Barb. Sup. Ct. Rep.*, 385; *Whitbeck* vs. *Paterson*, 10 *Ibid.*, 608; *Ruddon* vs. *M'Donald*, 1 *Brad. Rep.*, 352.)

THE SURROGATE. The deceased was a widow, and her only next of kin is a daughter residing in the State of Maryland. The will and codicil passed to probate upon constructive service of the citation by advertisement pursuant to the statute. Within a year after the probate, the daughter filed allegations against the validity of the will, and the competency of the proof thereof; and I have now to decide upon the sufficiency of the proof. There are several grounds of objection.

I. Want of testamentary capacity.

The deceased was attacked with typhus fever, and was removed from her residence to St. Vincent's Hospital, where the will was made, and where she died. Dr. Power, who was her attending physician at the Hospital, and who saw her daily, states that when he first saw her she appeared to be " very stupid and delirious;" that she afterwards rallied for two or three days, and then relapsed; that after the re-

lapse, Father Kein wished to have a consultation of physicians; that for the last four or five days of her life she "lay in a kind of stupor." He says : " I should suppose she was insensible. If you aroused her, you might get an answer from her, but that, perhaps, incoherent. This was for the last four or five days of her life. This is a usual occurrence in that disease. It is caused by derangement of the entire system." The Doctor was then asked whether, from his knowledge of her condition, she was able, in his opinion, to have made the subscriptions of her name to the will ; and he expressed the opinion that during the " rally " she was able, but not after the " relapse." On cross-examination, he said : " I have not a distinct recollection how long Mrs. Kerr continued in a stupor. I think it was more than two days. It may have been two days or five days ; but I think it was more than two. When not in a stupor, she was able to converse, and also to write her name. When she first came in there she was delirious, and then improved ; and then, in the latter stages of her sickness, she was delirious also. She was delirious when she died— that is, the last visit previous to her death she was delirious. When aroused from stupor she muttered incoherently, and you could not comprehend what she said."

Anne Gorman states that the decedent, the day after she went to the Hospital, spoke " very sensibly." She adds: "I saw her every day; sometimes I spoke to her, and she would answer me, and fall away again." Mrs. M'Ginnis nursed the decedent at the Hospital two weeks, night and day. She testifies that Mrs. Kerr was in a " kind of stupid state" all the time,— occasionally sensible for a short while. " Sometimes she would talk a little ; but it would not be long, and then she would go off into a slumber again." She " might be sensible half an hour at a time." " She was not able to sit up, three or four days before she died, unless she was propped up in bed. She could not help herself. She never took her drinks into her hands, but I put them in her mouth for

her." This witness states that the will was drawn three or four days before Mrs. Kerr's death, and that upon that occasion she was requested by Father Kein to go down stairs.

Dr. Murray, who visited the decedent in consultation with Dr. Power, says : "She was rather in a state of insensibility—the state in which persons usually are just previous to death. It was the day previous to her death. I was desirous of seeing her again, and called the next day, but was told she was dying, and did not go in. She showed a listlessness, and appeared unconscious of what was said to her. She had all the symptoms of a sudden dissolution when I first saw her." Mrs. Norton testifies that the decedent was taken sick on the 1st of May ; was taken to the Hospital on the 5th, and died on the 20th. She visited her there daily, and generally two or three times a day. She says, "I think it was about ten days before she died that I first thought she was at all unsettled in her mind. At the latter end of her sickness, before she died, her mind seemed to be affected—she seemed to be stupid. It was three or four days before she died, she got quite stupid. When she was sick in Second street, she dozed a good deal through the day. She would doze and fall asleep in the day time, after she went to the Hospital, while I was there ; but that was at the latter end." Mrs. Norton mentions some conversation she had with the decedent. "I asked Mrs. Kerr if I should write to her daughter. She said, No, the poor child would hear of her death time enough." *

* "She told me one day she was after making her will. She told me to tell my husband not to let any of the apartments, for it was to be sold. I asked if I should call to let Father Kein know how she was, as he was rather delicate. She said he was after being there ; was going out a bit into the country, and she said I need not call there. I mean by her saying she was after making her will, that she had made it. I went in the next day, and took some clothing to her. She gave me $47, and the keys of her bureau and the keys of the house where she lived, &c. I asked her

how much money there was; she told me to take what was there, and the keys, and to put them in no person's hands." "I gave one of the Sisters in the Hospital the money. * * Mrs. Kerr first gave the Sister the money and the keys, the same day she went there. She then took them away from her, and gave them to me the day after the will was spoken of, and I gave the Sister back the money the same day. She died about seven days after the time the money and the keys were given, as near as I can recollect." On being asked the condition of the decedent's mind when she gave her the keys and money, Mrs. Norton said, "She seemed as settled in her mind as ever she did, only she was weakly. She told me not to come too near her breath, that she had a very bad fever. Two days after that it seemed as if she was not settled in herself," &c.

This is substantially all the evidence relative to the capacity of the decedent, exclusive of the testimony of the subscribing witnesses to the will and codicil.

II. The time of execution.

The will and codicil are not dated. The time of their execution is material. Mrs. Norton states that when the decedent spoke to her about her will, it was seven days before her death. Elsewhere she says, she died about seven days after the money and keys were given to her. Again she says, "She told me this on Tuesday, and the next day (Wednesday) she gave me the keys. This is as near as I can think. It was on the previous Wednesday she left Second street." * * "I think she died Thursday, as near as I can recollect." Mrs. Norton elsewhere states that the decedent died on the 20th of May. The original petition for probate dates her death on the 21st, which was Wednesday. Mrs. Norton says, Mrs. Kerr went to the Hospital on Wednesday, but also fixes the date on the 5th of May, which was Monday. No great dependence can, therefore, be placed upon her exact recollection of precise dates. Now, on the other hand, Mrs. McGinnis, the nurse, says the will was drawn three or four days before Mrs.

Kerr's death. The recollection of Mr. Smyth, one of the attesting witnesses is very vague. He says Mrs. Kerr was in the Hospital three or four weeks; and though he states the will was executed May 15th, says, " I don't recollect how long after this Mrs. Kerr lived. It could not have been longer than a fortnight." Father Kein, in his first effort to fix the date, says : " I administered the sacraments to this woman before the will was spoken of. There was no will spoken of then. After that I called in Mr. Phelan, because I saw she was dying—that she would soon die." *     *
Again he says : " She next spoke about her will, when she was about to make it, a day or two, or a few days before her death. I think she lived three days after she made her will. I can't recollect precisely." *     * " I was there twice that day—first about noon, when she expressed a wish to have a will drawn ; and the second time, when I brought Mr. Phelan, and drew the will, in the afternoon. I can't say exactly what hour. In the morning, when I came, I found her sinking fast. There was only one physician attending her then, and I ordered a consultation, saying I would pay for it, if there were not means in hand to pay for it. I was there only twice that day. I administered the sacrament to her before that day—one or two days before." It thus appears that in the morning of the day the will was made, Father Kein thought "she was dying,"— " would soon die,"—was " sinking fast," and he ordered a consultation of physicians. Dr. Power testified that the consultation was ordered " after the relapse ;" and Dr. Murray, the consulting physician, states that " it was the day previous to her death " he called. If he attended the same day the consultation was ordered, the inference would be that the will was executed the day before she died, and the codicil the same day she died. However this may be, it is evident from Father Kein's statement, in connection with the evidence of the physicians, that the will was executed very shortly before her death, and after the relapse had became so plainly indicated that she was thought to be

sinking, and a consulting physician was directed to be called in. This brings the date of execution within the period when the decedent lay in a stupor, as described by Dr. Power. He says, " When aroused from stupor, she muttered incoherently, and you could not comprehend what she said."

III. Proof as to execution.

It is not impossible that a person in such a condition might, on being aroused from stupor, be capable of sensible action; but the proof to establish that such was the fact should be of the clearest character. Smyth, one of the subscribing witnesses, never saw the decedent except at the times the will and codicil were attested by him. His recollection of the transaction is evidently imperfect. He states that both papers were read to the decedent by Father Kein, and that she signed them; but he is unable to state whether she wrote with assistance or not. He says that after the will was read she " agreed " to it; and though he does not recollect exactly the words, thinks she said it was all right. He states that no one else was present, while Father Kein testifies that Mr. Phelan, one of the executors, was there. He says that she received no help from any person while he was in the room, and that " she raised herself;" and Father Kein states that he " assisted her, raised her in the bed, and supported her when she signed the will." At one time he says he was requested by Father Kein to witness the will, and the decedent heard the request; and again, that nothing was said about witnessing the will before Mrs. Kerr. What transpired in the presence of this witness was not of a nature to afford a very accurate test of the capacity of the decedent; and it is obvious that very little dependence can be placed upon his recollection of the circumstances.

The will in question is written on the first and second pages of a sheet of letter paper. It closes on the second page, and purports to be signed and attested in this way:

" To the children of Mary Dow, residing in Ireland, in county Kilkenny, Give and bequath two Hundred dollars, to be equally divided between them.　If there be a balance my executors will divided it among my relations that are not herein mentioned.

" Cathe<sup>rin</sup> Keer.

Phelan,
" I herby appoint Mich'l of 2d st., and John Kelly, of 9th st., as my executors to this my last will testament.
　　" Witnesses,　　　　　R. Kein,
　　　　　　　　　　" Mathew M. Smith.

pay
" I herby order my executors to‸ all my lawful and debts & funeral expenses—should it please the Almighty now to call me.　This they will do before paying any legacy above mentioned.

" Cath<sup>e</sup> Keer."

Now, Smyth says he thinks the decedent signed the will but once, and that Father Kein wrote nothing on the will after she signed it—that her name was not signed to any part before he came into the room, and he saw her make the *first* signature.　There was nothing written below the place where he put his name as a witness, when he signed. He says, " The second signature (of the name of Mrs. Kerr) I am doubtful about—I don't consider it the same hand as the first, and I don't recollect seeing her sign it."　Mr. Smyth here differs materially from the other witness, and on an important point.　Father Kein states that he wrote the will at the dictation of the decedent—that when she signed it he supported her body and her arm above the elbow —that she wrote both the signatures on the second page— she was perfectly sensible—he did not take told of her hand and guide it, and did not write her name—all on the first two pages was written before she signed it—after she

signed the first time, he thinks he went back to the bed a second time, raised her up, and she signed again. I do not think it necessary to enter into a more critical examination of the evidence of this witness. The name of the decedent was Catharine Kerr. It is abundantly proved that she wrote her name in that way; and, besides the evidence of a witness against the genuineness of the signatures to the will and the codicil, I have had placed before me several documents executed by her, to which her name is invariably subscribed as Catharine Kerr. It is strange, therefore, that the signatures to the will and codicil are " Catharine Keer." Father Kein calls her Catharine Keer in his testimony, and the original probate was granted in the same name; but there is no pretence that was her name, or that she was ever so called except by the two witnesses to the will. If Mrs. Kerr signed the will, she did not sign in her own name, but in the witnesses' version of her name. This circumstance prevents me from being satisfied that the will was subscribed by the decedent, as stated by the attesting witnesses; and, if on so material a point they fail to recollect with accuracy, and the evidence shows that they are mistaken, or leaves the correctness of their statement in doubt, then, in a case where, as I have stated, the circumstances call for the most satisfactory elucidation of the whole transaction, such clear and unequivocal proof as the law demands, is wanting.

IV. Form of the will.

But, independently of these considerations, there is another objection which of itself I deem fatal to the will. The statute directs that the will shall be subscribed by the testator " *at the end*," and that each of the witnesses shall sign his name " *at the end of the will.*" The same place is here spoken of—*the end;* and the testator and the witnesses must all unite in authenticating the instrument at its point of completion. I do not mean to refine as to the exact place where they are to sign; but the object of the law has been not only to exclude a signature at any other part, but

also to have the concurrence of all the parties as to the end of the will, and to secure the instrument from interpolation or unauthorised addition. It is not to be regarded as a merely arbitrary rule. The provision is a judicious one, and care should be taken not to break in upon it, by lax interpretation. In England the courts have gone great lengths in exacting a literal compliance with the statute which directs the will to be signed "at the foot or end thereof." If an unnecessary and unreasonable blank space is left between the signature of the testator and the end of the will, probate is denied on that ground alone. (*Williams on Exrs.*, *p.* 65.) Perhaps since the case of *Smee* vs. *Bryer* (6 *Notes of Cases*, 420, *affirmed in the Privy Council*), too rigid a rule has prevailed. In the *Goods of Lewis Henry*, 2 *Robertson's Ecclesiastical Reports*, 140, the will ended on the second page, having a blank space under the last line, of one inch and three-tenths, and at the head of the third page the words, "Signed by me in presence of the undersigned," immediately after which followed the signature of the testator, and then an attestation clause signed by the witnesses; and it was held, by Sir Herbert Jenner Fust, not to have been validly executed. In the *Goods of Milward*, 1 *Curteis*, 912, the will was written on two sides of paper, the testator signed at the bottom of the first side, which signature was attested, and that side terminated with an unfinished sentence, and the will concluded on the second side, "Dated this 11th day of April, 1838;" but there was no signature in that place : the will was denied probate. In the present case, if the first signature of the name of Catharine Kerr is at the end of the will, there is no attestation of the witnesses at that place. After that comes the appointment of executors, and this is attested by the witnesses, but not subscribed by Mrs. Kerr; and then comes another clause purporting to be signed by Mrs. Kerr, but which is not attested by the witnesses. The decedent and the witnesses—supposing Mrs. Kerr's signature to be genuine—do not agree upon any one point as the end of the will. The

M'GUIRE *vs.* KERR.

last clause is not attested, and it must be excluded from probate. The clause next to the last is not signed by the testatrix, and must be excluded likewise; and then, all that precedes the first signature of the testatrix, is not attested at its end—so that the entire instrument must be rejected. I think, that the testator and witnesses must agree as to the instrument—what it is, and where its end is. But for the testator to affirm, by his signature, that one part is the will, and the witnesses to affirm, by their signatures, that another clause is to be added, is such a disagreement as defeats the requirement of the statute that the will must be signed by all parties at the end. The act of authentication must take place at the termination of the testamentary disposition, and the testator and the witnesses must concur in determining that point. The law is no more fulfilled by the testator signing in the middle of the will, and the witnesses attesting at the end, than by the witnesses signing in the middle, and the testator at the end. They must all subscribe at the end. The wisdom of this statutory provision seems to me abundantly illustrated by the evidence in this case. This defective execution has not been remedied by anything contained in the codicil; for the codicil is contained on a separate sheet of paper, and does not in any way refer to the will. I am therefore of opinion, that in view of the testimony respecting the bodily and mental condition of the decedent at the period of the alleged execution of the will, the presumption against its valid execution has not been removed by clear and satisfactory proof. This applies with greater force to the codicil. In addition to these grounds, the will has not been executed according to the requisite statutory ceremonials. There must, therefore, be sentence declaring the instruments insufficiently proved, and invalid, and annulling and revoking the probate.